Froessel, J.
In a proceeding instituted by the District Attorney of Suffolk County pursuant to section 8 of the Indian Law, the County Court of Suffolk County adjudged that appellants were intruders upon lands comprising part of the Shinnecock Indian Reservation in Southampton, Long Island. The court directed the issuance of a warrant for their removal and delineated the boundaries of the 11 lands owned and occupied by the Shinnecock Tribe of Indians and affected by this determination ’
The proceeding involved a 9-acre triangular parcel fronting on the southerly side of Montauk Highway. Appellants claimed title to this land and were in the process of erecting houses for the purpose of settling and residing thereon. In order to determine whether or not appellants were intruding upon Indian land, it was necessary for the County Court to consider chapter 46 of the Laws of 1859, and two deeds executed in accordance with that enactment.
Pursuant to the statute and deeds, all land north of “ an established and well defined” line running along an Indian ditch was granted by the Trustees of the Shinnecock Tribe to the Trustees of the Town of Southampton, and all land south of that line was granted by the latter to the former. The dividing boundary line was described as “ commencing at the head of the creek on the east side of said [Shinnecock] Neck, and running along the Indian ditch, where the fence now stands, to the Stephen Post meadow, so called; thence along the old ditch on the south side of the said meadow to old Fort Pond, where the water fence formerly stood.” (L. 1859, ch. 46, § 1; emphasis supplied.)
Appellants’ claimed source of title to the disputed parcel stemmed from a deed to a large tract, recorded in 1861, from the town trustees to appellants’ predecessors in title. The parties stipulated that that deed conveyed 3,200 acres and included “ the land lying immediately to the north of the Indian Ditch”. The issue, as framed by the County Court, was: 1 ‘ Where was the old Indian Ditch mentioned in the legislation of 1859 located when the above conveyances were exchanged? ” Petitioner sought to prove that the ditch ran completely along the southerly shoulder of an old sand road that is now Mon-i auk Highway. Appellants, on the other hand, contended that the old Indian ditch started at an easterly point along Montauk *439 Highway and then veered off at an angle in a southwesterly direction until it reached a point some 340 feet south of the highway. A total of 24 witnesses testified, and a mass of documentary evidence was introduced.
The trial court resolved the disputed issue of fact in favor of petitioner. It found that the Indian ditch referred to in the 1859 statute and deeds ran along the southerly line of the old sand road and had been obliterated by the modernizing of Montauk Highway. The ditch which appellants claimed was the “ Indian ditch ” was found 11 to be just another ditch with which the reservation is lined in several places ”. After a lengthy colloquy, the court also denied appellants’ motion made at the very end of the case to dismiss the complaint on the ground that the court lacked jurisdiction of the subject matter of the proceeding.
Appellants urge on this appeal that “ Section 8 confers a limited jurisdiction upon the County Court to award summary relief in certain special circumstances; i.e., where there is no dispute as to the Indian Tribe’s ownership or right of possession as respects the particular land ’ ’. Appellants contend further that where alleged intruders enter upon lands under color of title, and the evidence discloses a substantial dispute on the issue of ownership, the remedy provided by section 8 may not be invoked without violating their constitutional right to a trial by jury.
The constitutionality of the predecessor of section 8 (L. 1821, ch. 204) was upheld by this court and by the Supreme Court of the United States in People ex rel. Cutler v. Dibble (16 N. Y. 203, affd. 62 U. S. 366). The Dibble case involved two treaties entered into in 1838 and 1842 between the United States Government and the Seneca Indian Nation. In these treaties, as outlined by the Supreme Court in Fellows v. Blacksmith (60 U. S. 366), the Seneca Nation conveyed four reservations in western New York to two white persons named Ogden and Fellows, pursuant to certain terms and conditions — which included a determination by arbitrators of the amount to be paid, the apportionment thereof, and the filing of the arbitrators’ report with the Department of War. The Seneca Nation agreed to remove to a new residence in the West within five years, with the financial aid of the United States Government. Neither *440 treaty, however, made any provision as to the manner in which the Indians were to surrender possession.
The Fellows case involved an action of trespass against the grantees, who had forcibly taken possession of the Tonawanda Reservation, one of the four conveyed. The Supreme Court held (60 U. S., supra, p. 372) that “ the grantees derived no power, under the treaty, to dispossess by force these Indians, or right of entry, so as to sustain an ejectment in a court of law; that no private remedy of this nature was contemplated by the treaty, and that a forcible removal must be made, if made at all, under the direction of the United States ”.
In the Dibble case (supra), the defendants, who claimed title through Ogden and Fellows, entered into possession of the Tonawanda Reservation, and a proceeding was brought by the District Attorney, under the predecessor of section 8, to remove them as intruders. Although the statute, by its terms, did not then require it, defendants were notified of the institution of the proceeding. They appeared before the County Judge and challenged his jurisdiction “ on the ground that they had entered and occupied the lands, claiming title under a written instrument adversely to the Seneca nation of Indians, and therefore, by the Constitution and laws of the State, they were entitled to a trial by jury, according to the course of the common law, and could not thus be removed by summary proceedings under this act.” (62 U. S., p. 369.) This plea, which is identical to the one now being pressed by appellants, was overruled by the County Judge. The defendants then pleaded, on the merits, that title to the land and hence the right of possession was in them through the treaty conveyance to Ogden and Fellows.
This court held (16 N. Y., supra, p. 216): “ The case of Blacksmith v. Fellows is decisive * * # against the claim of [defendants] to enter upon and occupy the lands at present ” (emphasis supplied), and emphasized (pp. 215-216) that “ it .aowhere appears, nor was it pretended ’ ’ that the conditions precedent to defendants’ right of entry — the making and filing of the arbitration award—had occurred. Judge Bbowjst, writing for the majority, made it clear at the outset of his opinion (16 N. Y., p. 211)—“ I decline to consider whether Ogden and Fellows obtained a good title to the lands known as the Tonawanda reservation, under the grant to them, and the treaties *441 of January 15, 1838, and of May 20, 1842; because I think the rights of the relators to occupy the lands in controversy may be disposed of upon other grounds.” (Emphasis supplied.) Since only the United States Government had the right, under the treaties, to remove the Indians from their reservation, the defendants were ordered removed as intruders, regardless of the fact that they may have had good title to the lands.
In upholding the constitutionality of the statute, this court wrote, in part (16 N. Y., supra, pp. 213-214): “ This right of summary removal is indispensably necessary to the protection of its [the State’s] own property, and to enable the state to fulfill its duties and obligations to the remnants of the Indian tribes within its borders, who are too feeble and helpless to protect themselves. It is under no constitutional or other obligation to wait the judicial determination of the courts to remove intruders from what are indisputably the ungranted lands of the state, or the reservations of the Indian tribes. The moment the intrusion is made out, and the nature of the territory intruded upon appears, there is nothing to be tried, and nothing for the courts to determine, in respect to the right of occupancy and possession. Besides, the order of removal adjudicates upon no claim, and determines no right or title, but leaves the party removed to the usual remedies to assert and establish any title to the locus in quo which he may deem himself to possess.” It will be noted that the last sentence referred to the order of adjudication in that case, which determined no title only because the court did not find it necessary to pass upon title.
Unlike the 1821 statute involved in the Dibble case (supra), present section 8 requires the County Court to “ issue a notice directed to the person against whom complaint is made ” to appear and answer, and it is only after ‘1 proof of the personal service of such notice ” that it is authorized to “ take proof of the facts alleged in the complaint ” (see, in this connection, Chief Judge Denio’s discussion in the Dibble case, 16 N. Y., pp. 218-220). Section 8 then commands the court to ‘ ‘ determine whether such person is an intruder upon the lands of such reservation ”, and in order to do so it obviously must determine whether the land is in fact part of an Indian reservation. The court’s jurisdiction to issue the warrant in the instant case depended upon whether the disputed parcel was Indian land, and it is settled *442 beyond cavil that a court has jurisdiction to determine the facts upon which its jurisdiction depends (Matter of United States of Mexico v. Schmuck, 294 N. Y. 265, 271-273; Consumers Lbr. Co. v. Lincoln, 225 App. Div. 484, 485; Stoll v. Gottlieb, 305 U. S. 165, 171-172; United States v. Mine Workers, 330 U. S. 258, 289-295; 21 C. J. S., Courts, § 113). Furthermore, where a County Court is vested by statute with jurisdiction over a special proceeding, it has the same power in and over the proceeding as the Supreme Court (Civ. Prac. Act, § 69), including the jurisdiction to decide questions of title to real property (Matter of Yaras [City of Albany], 283 App. Div. 214, 218, affd. 308 N. Y. 864).
This court declined to pass upon the issue of title in the Dibble case (supra), not because it felt powerless to decide the issue but because it was not dispositive of the controversy. The court did in fact construe the far more solemn documents, the treaties, to determine whether defendants were intruders, just as the court here construed the description in the 1859 statute and deeds to determine the same issue. Appellants had a full dress trial on the issue of ownership, and their contention that the court was obliged to dismiss the proceeding as soon as the evidence showed a genuine dispute as to title to the parcel is untenable.
As to the alleged constitutional right to a jury trial on the issue of title, we do not reach the merits of this claim, as appellants are estopped by their conduct from asserting it. At the very outset of the trial, it clearly appeared — by stipulation — that the principal issue in the case was a dispute as to ownership. Thereafter, upon the court’s own inquiry, the defense attorney assured the court that his clients had no objection to the procedure pursued by the District Attorney. The court pointed out that it did not ‘ ‘ want to waste a lot of time and money taking proof, and then have a question of jurisdiction or a procedural question raised ”, and the defense attorney replied: “ There is no question on that score on behalf of my defendants.”
While it is well settled that parties may not by their consent confer jurisdiction over the subject matter on a court (Meyers v. American Locomotive Co., 201 N. Y. 163, 166; Shea v. Export S. S. Corp., 253 N. Y. 17, 21), the right to a trial by jury is a personal right which must be timely asserted. Since appellants *443 consented to have the issue of ownership tried by a court of competent jurisdiction and participated actively on the merits, they cannot now be heard to complain (Baird v. Mayor, 74 N. Y. 382; Security Discount Associates v. Weissbaum, 283 App. Div. 920).
The error in the proceedings below, which requires a reversal, lies in the decision of the Appellate Division. The court specified in its order that it was affirming the order of the County Court ‘1 upon the opinion and decision slip of the court herein ’ ’. In its opinion, the Appellate Division, relying upon the Dibble case (supra), held: “ The order [removing appellants as intruders] does not determine right or title in the land. It leaves the parties who are removed from the land in question to the usual remedies to assert and establish any title to the land which they deem themselves to possess ”.
The order of the trial court, however, from each and every part of which appellants appealed, not only squarely adjudged that the disputed parcel was part of the Shinnecock Indian Reservation, but went so far as to describe, by degrees, minutes and seconds, the boundaries of the lands “ owned and occupied by the Shinnecock Tribe of Indians and affected by this determination ” (emphasis supplied). By isolating the language used in the Dibble case (supra) from the context of the peculiar facts there involved, the Appellate Division erroneously assumed that it could divest appellants of possession without passing on their claim of ownership.
As previously noted, the judgment of this court in the Dibble case (supra) literally did not “ determine right or title in the land ”, since there was no dispute that the Seneca Indian Nation had conveyed the lands in question to defendants’ predecessors in title. All that case decided was that under the treaties of conveyance the defendants had no right of entry onto the reservation lands until certain conditions precedent occurred. Under the peculiar circumstances of the Dibble case, the right to occupy the lands had not yet vested in the record owners of the fee. Since the Indians were not obliged to surrender possession until directed to do so by the United States Government, it was possible to evict defendants as intruders, notwithstanding their alleged title to the premises.
*444 In the instant case, however, title and the right to possession were inseparable, and the trial court lacked jurisdiction to oust appellants as intruders without a finding that the disputed parcel was, in fact, Indian land. The court made the requisite finding that the lands in question were part of the Shinnecock Reservation, thereby sustaining its jurisdiction, and its order most decidedly determined “ right or title in the land ”. By holding to the contrary, without passing on the factual issue of ownership, the Appellate Division ruled, in effect, that appellants could be removed as intruders, notwithstanding the fact that they might own the land in question. Since this ruling is erroneous as a matter of law, section 606 of the Civil Practice Act requires us to remit the case to the Appellate Division for its determination upon the questions of fact raised in that court.
In short, the County Court, having jurisdiction of the parties and the proceeding, had power under section 8 to decide the issue of ownership. The Appellate Division, however, could not affirm the order divesting appellants of possession without deciding who had title to the land and hence the right to possession.
The order appealed from should be reversed, without costs, and the matter remitted to the Appellate Division for further proceedings not inconsistent with this opinion.